IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ERIKA CREECH, DAVID ELDER, TYLER JONES, JULIE OLSEN, CODY THYGESEN and JORDAN SCHWEIZER, **Plaintiffs,** v. STRYKER CORPORATION and STRYKER SALES CORPORATION, **Defendants.** | **MEMORANDUM DECISION AND ORDER** **Case No. 2:07CV22 DAK** |

This matter is before the court on several motions: (1) Stryker Corporation and Stryker Sales Corporation's (collectively referred to as "Stryker") Motion for Summary Judgment; (2) Stryker's Motion for Protective Order Re: (a) Plaintiffs' Cumulative Expert Causation Evidence; (b) to Limit Testimony of Plaintiffs' Non-Retained Causation Experts, or Alternatively, to Compel Depositions; and (c) to Strike Plaintiffs' Untimely Claims for Psychological Injury and Treatment and Portions of Life Care Plan Expert's Opinions, or Alternatively, to Compel Rule 35 Psychological Evaluations; (3) Plaintiffs' Motion to Exclude Defendants' Experts as Cumulative; and (4) Plaintiffs' Motion to Strike Untimely Disclosed Fact Witnesses.

A hearing on the motions was held on November 30, 2011. At the hearing, Plaintiffs Erika Creech, David Elder, Tyler Jones, Cody Thygesen, Julie Olsen, and Jordan Schweizer ("Plaintiffs") were represented by James T. Blanch, Charles H. Thronson, and Colin P. King. Stryker was represented by Brent O. Hatch, Ralph A. Campillo, and Phillip J. Russell. Before the hearing, the court carefully considered the memoranda and other materials submitted by the

parties.  Since taking the matter under advisement, the court has further considered the law and facts relating to these motions.   Now being fully advised, the court renders the following Memorandum Decision and Order.

## I.    STRYKER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. BACKGROUND

The six individual Plaintiffs in this lawsuit all underwent shoulder surgery between February 2003 and July 2004 and were treated with a post-surgical anesthetic solution delivered into their shoulder joints via Stryker's pain pump, which is a medical device used to administer prescribed amounts of pain medication directly to a certain area of the body.  Plaintiffs subsequently developed severe glenohumeral chondrolysis in the shoulder treated with the pain pump.[1]  Plaintiffs then filed suit against Stryker, alleging products liability, negligence, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose.[2]

Plaintiffs maintain that Stryker was on notice that the use of pain pumps to deliver pain

_____

[1]  Glenohumeral chondrolysis is a rare and painful condition involving the rapid and permanent destruction of articular cartilage in the shoulder joint.

[2]  The court will not separately address the implied warranty claims. Under Utah law, the elements of breach of an implied warranty and products liability are essentially the same. Thus, Plaintiffs' "implied warranty claims are controlled by, and indistinguishable from, the products liability claim."  *See Salt Lake City Corp. v. Kasler Corp*., 855 F. Supp. 1560, 1567 (D. Utah 1994) (citations and footnote omitted) (holding that, to the extent plaintiff "set[] forth a claim for breach of warranty as a tort concept, it is subsumed by the court's analysis and decision with respect to the strict liability claims"); *see also Straub v. Fisher and Paykel Health Care*, 990 P.2d 384, 389 n.1 (Utah 1999) ("[T]he elements of strict liability and breach of warranty are essentially the same.").

2

medication directly to the shoulder joint could cause harm.  According to Plaintiffs, Stryker did not conduct any tests regarding the safety of continuous intra-articular infusion of local anesthetics, but Stryker nonetheless marketed its pain pumps for such use and failed to warn physicians that pain pumps had not been cleared for such use by the FDA.

B.  STRYKER'S ARGUMENTS

In its motion, Stryker contends that there are no genuine issues of material fact that would preclude entry of judgment in its favor.  Stryker sets forth evidence that the connection between post-arthroscopic glenohumeral chondrolysis and pain pumps was unknown to medical science at the time of the surgeries at issue here.  Stryker also sets forth evidence that the current scientific consensus is that the prescription of particular volumes and concentrations of local anesthetics into the joint space is the suspected cause of chondrolysis, not the mechanics of–or anything else inherent to–the pain pump.

In addition, Stryker asserts that Plaintiffs' claims fail on the issue of causation.   Stryker argues that Dr. Beck, Plaintiffs' orthopedic surgeon, developed his protocol for use of pain pumps entirely independent from any communications from Stryker and that the undisputed evidence indicates that a different warning would not have changed his use of the pain pumps.

As for the pain pump's regulatory history, Stryker emphasizes that its device had been cleared by the FDA for infusion of local anesthetics directly into an intraoperative site for postoperative pain management.  The pain pump is a "Class II" device under the federal Medical Device Amendments of 1976 (the "MDA").  *See* 21 U.S.C. §§ 360d, 360c(a)(1)(B), and 21 C.F.R. § 880.5725(b).  A new Class II medical device must be marketed pursuant to the FDA

premarket approval process, unless it is shown to be the "substantial equivalent" of a legally

marketed device that existed before the MDA.   A device that is determined by the FDA to be the

substantial equivalent of a "predicate device" may be marketed under a "510(k) notification"

without further clinical study or premarket approval.  21 U.S.C. § 355(b)(1)(F).

According to Stryker, its pumps were cleared under the 510(k) notification process, and

thus found to be the substantial equivalent of earlier versions in existence prior to the MDA and

to other pumps similarly approved.  The instructions for use do not recommend any particular

surgical procedure for which the pump may be used, nor do they specify any particular

medications for use with the pump.

Stryker contends that it is entitled to summary judgment because: (1) the undisputed

evidence indicates that it neither knew nor should have known of a risk of chondrolysis

associated with its pain pump sufficient to prompt a duty to warn as of July 2004, the time of the

last Plaintiff's surgery; (2) the undisputed evidence indicates that Plaintiffs' surgeon's use of pain

pumps was entirely unrelated to any Stryker representation, and thus no Stryker warning or lack

thereof was a proximate cause of Plaintiffs' alleged harm.

### C.  PLAINTIFFS' ARGUMENTS

Plaintiffs paint a very different picture of the events involved in this lawsuit, and they

contend that genuine issues of material fact preclude judgment on any of its claims.   Plaintiffs

contend that Stryker designed, marketed, and always intended its pain pump to be used for

continuous intra-articular infusion of local anesthetics.  But, according to Plaintiffs, Stryker did

not review the available medical literature regarding the negative effects local anesthetics have

4

on cartilage cells before putting its pumps on the market for that use, and Stryker did not conduct

any tests regarding the safety of continuous intra-articular infusion of local anesthetics before

putting its pumps on the market for that use.

Specifically, Plaintiffs argue that, even though Stryker understood prior to 2005 that the

local anesthetics Marcaine (a.k.a. bupivacaine) and ephinephrine were commonly used in Stryker

pumps by physicians, Stryker did not test the safety of infusing 270 mL's of those drugs over two

days or more.   Indeed, according to Plaintiffs, if Stryker had researched the medical literature to

determine if this continuous infusion of local anesthetics over multiple days posed a threat,

Stryker would have discovered that there was medical and scientific literature showing that

continuous injection of commonly used anesthetics into a joint space over a two to three day

period would likely damage the cartilage in the joint.

Also, according to Plaintiffs, Stryker received a "clarion signal" that research and testing

were necessary to determine whether continuous intra-articular infusion of local anesthetics was

safe: on two separate occasions, years before Plaintiffs' surgeries, the FDA rejected applications –

one submitted by Stryker's predecessor, McKinley Medical, and the other by Stryker itself–for

approval to market pain pumps for intra-articular use.   While the pumps were cleared through

the 510(k) notification process, the pumps were approved on the basis that the devices were

substantially equivalent – for the indication for use stated in the enclosure to each 510(k)

approval–to legally marketed predicate devices marketed in interstate commerce prior to May 28,

1976.   While the pumps were cleared for the general indication of "intraoperative" use, they

have never been cleared for the use in the synovial cavity (a.k.a. intra-articular use), and in fact,

the FDA denied applications to use the pumps in the synovial cavity.

Plaintiffs argue that Stryker management did not disclose the truth regarding its lack of research and testing and its failure to obtain FDA approval to its own sales force, to doctors, or to patients such as Plaintiffs in this case.   Rather, Stryker marketed pain pumps for intra-articular use to orthopedic surgeons, despite knowing that the FDA had at least twice rejected requests to approve the pumps for intra-articular use.   Plaintiffs contend that Stryker turned Plaintiffs into unknowing test subjects who became the first human examples of the severe injury caused by intra-articular infusion of local anesthetics.

Plaintiffs assert that a reasonable jury could find that Stryker acted negligently or worse, and proximately caused severe and permanent injury to Plaintiffs' shoulders.  Accordingly, they claim, their negligence claims should be submitted to a jury.

Moreover, and regardless of the state of the medical literature, Plaintiffs argue that they have asserted more than a "failure to warn" claim, as characterized by Stryker.   Plaintiffs have also alleged that Stryker's pain pump is defective and unreasonably dangerous; that Stryker negligently designed and marketed its pumps for an untested and unapproved use; and that Stryker negligently failed to test its pumps for the very use for which Stryker designed and marketed its device, i.e., intra-articular infusion of local anesthetics.   Thus, Plaintiffs contend, they have raised many factual disputes on their strict liability claims, thereby precluding summary judgment.

### D.  STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).[3]  A dispute is "'genuine' if there is sufficient evidence on each side so that a rational trier

of fact could resolve the issue either way." *Adler v. Wal–Mart Stores, Inc*., 144 F.3d 664, 670

(10th Cir. 1998).  A fact is "'material' if under the substantive law it is essential to the proper

disposition of the claim." *Id*.  When applying this standard, this court views the evidence and

draws reasonable inferences therefrom in the light most favorable to the nonmoving party."

*Garrison v. Gambro, Inc*. 428 F.3d 933, 935 (10th Cir. 2005).

**E.      DISCUSSION**

*1.      Negligence Claims*

A long-established principle of Utah law is that negligence is a question of fact for the

jury, and summary judgment on a negligence claim shall be granted only in the clearest of

circumstances.  *Hunt v. Hurst*, 785 P.2d 414, 415 (Utah 1990).   The Utah Supreme Court has

defined negligence as "a failure to exercise the degree of care which a reasonable person would

have exercised under the same circumstances, whether by acting or by failing to act." *Barson v.*

*E.R. Squibb & Sons, Inc.,* 682 P.2d 832, 835 (Utah 1984) (internal citation omitted).   The

*Barson* court further explained that "[i]n cases where the alleged negligence consists of a failure

to act, the person injured by another's inaction must demonstrate the existence of some special

---

[3]   Effective December 1, 2010, the summary judgment standard previously enumerated in subsection (c) of Rule 56 of the Federal Rules of Civil Procedure was moved to subsection (a), with one word changed from the previous version: genuine "issue" became genuine "dispute." Fed. R. Civ. P. 56 advisory committee's note (2010 Amendments). "The standard for granting summary judgment remains unchanged." *Id*.

relationship between the parties creating a duty on the part of the latter to exercise such due care in behalf of the former." *Id*. (citing *DCR Inc. v. Peak Alarm Co.,* 663 P.2d 433, 435 (Utah 1983)).   In a products liability case, a plaintiff must therefore prove that there was a duty owed by the defendant to the plaintiff, that the duty was breached and that the conduct complained of was the cause in fact of the injury.[4]  *Id*.

In addition, a manufacturer is held to be an expert in its particular field and is under a "continuous duty . . . to keep abreast of scientific developments touching upon the manufacturer's product and to notify the medical profession of any additional side effects discovered from its use." *Id*. at 836.   The manufacturer is responsible therefore for not only "actual knowledge gained from research and adverse reaction reports," *id.,* but also for "constructive knowledge as measured by scientific literature and other available means of communication." *Id.* (citing *McEwen v. Ortho Pharmaceutical Corp*., 528 P.2d 522, 529 (Or. 1974)).   A manufacturer has a duty to "design its product so as to eliminate any unreasonable risk of foreseeable injury." *Henrie* v. *Northrup Grumman Corp.,* 502 F.3d 1228, 1236 (10th Cir. 2007) (citations omitted).   Under Utah law, what was reasonably foreseeable to a manufacturer like Stryker is generally a question

---

[4]  Stryker contends that no duty existed to Plaintiffs as a matter of law because it did not know and had no reason to know of any risk of harm associated with its pain pump.  Plaintiffs, on the other hand, seek a finding by the court that Stryker owed a duty to Plaintiffs.  The initial question of the existence of a legal duty in tort cases is a question of law for the court to determine.  *See Yazd v. Woodside Homes Corp*., 143 P.3d 283 (Utah 2000).   Given a manufacturer's duties set forth in the discussion below, however, it is unclear why Plaintiffs seek a ruling that a duty exists to Plaintiffs under the factors enumerated in *Slisze v. Stanley-Bostitch*, 979 P.2d 317 (Utah 1999).   If Plaintiffs seek additional legal rulings about Stryker's duty to Plaintiffs, they may file a concise motion to that effect by the deadline for motions in limine.

of fact.  *See, e.g., Ostler* v. *Albina Transfer Co.,* 781 P.2d 445, 449 (Utah Ct. App. 1989).   A

manufacturer also has a duty to warn of the dangers associated with its product.  *Barson,* 682

P.2d at 835.

Here, Plaintiffs claim that  Stryker was negligent in: (1) failing to conduct adequate

testing and research to determine whether intra-articular infusion posed a risk to patient safety

before selling its pain pumps for intra-articular use; (2) failing to warn surgeons that intra-

articular use was untested, had been rejected for clearance by the FDA, and was potentially

harmful to the joint; and (3) manufacturing and promoting its pumps for intra-articular

placement, a use which the FDA twice refused to approve.

The court finds that Plaintiffs have clearly created genuine issues of material fact

regarding whether Stryker was negligent in these acts or omissions.  Plaintiffs present at least

some evidence that Stryker should have known of toxicity concerns associated with the

administration of local anesthetics directly into the joint area.[5]  Plaintiffs' expert, Dr. Stephen

Trippel, opines that prior to July 2004, medical and scientific literature existed which would have

put Stryker on notice that continuous injection of commonly used anesthetics into a joint space

over a period of two to three days would likely harm the cartilage in the joint.  He also states that,

based upon at least twelve articles published before 2003, and upon what was known about

---

[5]  Stryker repeatedly argues that the undisputed evidence demonstrates that there were no
studies associating the use of pain pumps with chondrolysis as of the date of the last surgery at
issue.  To be clear, to create a disputed issue of fact, Plaintiffs need not show that Stryker should
have known of the specific injury–chondrolysis.  *See Schoenborn v. Stryker Corp*., 2011 WL
2709550 (D. Or. July 11, 2011) .

cartilage, chondrocytes, and the glenohumeral joint of the shoulder, Stryker should have known both that continuous infusion of commonly used anesthetics over a period of two to three days created a risk for causing injury to the cartilage of the shoulder joint, and that cartilage damage in the shoulder can be a serious clinical problem.

Plaintiffs have also presented documents and testimony regarding the lack of FDA clearance or approval for "inter-articular injection" of a certain pain medication and referencing anesthetic "toxicity" concerns associated with pain pump use.   Finally, the evidence must be considered against the backdrop of Stryker's regulatory and marketing efforts and the lack of a specific indication for the use of pain pumps in the joint space, the FDA's determination that no predicate device established the efficacy and safety of such use, and Stryker's continued promotion of the pain pumps for use in the joint space without a specific indication cleared by the FDA.

Construing all inferences in favor of Plaintiffs, the court finds that they have presented admissible evidence to create a genuine issue of material fact as to whether Stryker knew or should have known or anticipated that the administration of local anesthetics directly into the shoulder joint was toxic or otherwise harmful.

### 2. *Strict Liability Claims*

 "Products liability claims require proof of a defective product, which can include manufacturing flaws, design defects, and inadequate warnings regarding use." *Dimick v. OHC Liquidation Trust*, 157 P.3d 347 (citing *Bishop v. GenTec Inc*., 48 P.3d 218 (Utah 2002)).  Utah has expressly adopted the doctrine of strict products liability set forth in Section 402A of the

Restatement (Second) of Torts.  *Schaerrer v. Stewart's Plaza Pharmacy, Inc.*  79 P.2d 922 (Utah

2003); *Grundberg* v. *Upjohn Co.,* 813 P.2d 89, 91 (Utah 1991).  In applying section 402A, Utah

courts require a plaintiff to prove: (1) that the defect or defective condition of the product made

the product unreasonably dangerous; (2) that the defect was present at the time of the product's

sale; and (3) that the defective condition was the cause of the plaintiff's injuries.  *Schaerrer*, 79

P.2d at 928.

 Plaintiffs have created genuine issues of material fact as to whether Stryker is strictly

liable to Plaintiffs based upon the pain pump's allegedly defective design and Stryker's failure to

warn of the alleged danger associated with the pain pump's use.[6]

   *3. Causation*

 Stryker contends that Plaintiffs cannot demonstrate that any failure to warn on the part of

Stryker caused their alleged injuries.   The court disagrees.   Plaintiffs have presented evidence

from which a reasonable jury could conclude that, had Stryker disclosed the truth to Dr. Beck,

Dr. Beck would not have placed the catheter of Stryker's pump in the intra-articular spaces of

Plaintiffs' shoulders.  While Stryker may present its evidence concerning the potential lack of a

causal connection, a jury is also entitled to hear Dr. Beck's testimony, which will be considered

in the context of Stryker's marketing strategies, what Dr. Beck was allegedly told by Stryker

---

 [6] Despite Stryker's argument to the contrary, comment K offers no protection to Stryker.
In *Grundberg v. Upjohn Co*., the Utah Supreme Court ruled that comment K to section 402A
provided protection to prescription drug manufacturers.  *Grundberg v. Upjohn Co*., 813 P.2d 89,
(Utah 1991). The court limited this ruling to design defect claims against prescription drug
manufacturers.  *Id*. at 92, 95.  Utah law does not preclude strict liability design defect claims
against medical product manufacturers.

representatives, and his sworn testimony that he would not have used pain pumps to administer anesthetics directly to the joint space if he had known the FDA had not cleared the pain pumps for such use.[7]   Accordingly, summary judgment is not appropriate on the issue of causation.

### 4.   Request for Punitive Damages

Punitive damages are warranted where "it is established by clear and convincing evidence that the acts *or omissions* of the tortfeasor are the result of . . . a knowing and reckless indifference toward, and a disregard of, the rights of others."  Utah Code Ann. § 78B-8-201 (emphasis added).   As stated in the plain language of the statute, two types of conduct justify an award of punitive damages: (1) "willful and malicious or intentionally fraudulent conduct" or (2) "a knowing and reckless indifference toward, and a disregard of, the rights of others."  *Id.*  Here, Plaintiffs contend that Stryker's actions or omissions fit into the "knowing and reckless indifference" requirement.  Specifically, "[t]o prove that a tortfeasor's actions were knowing and reckless, a party must prove that the tortfeasor knew of a substantial risk and proceeded to act *or failed to act* while consciously ignoring that risk."  *Daniels* v. *Gamma West Brachytherapy, LLC,*

---

[7]  Stryker objects to Dr. Beck's allegedly improper hearsay testimony regarding what a Stryker representative told him about its high-volume pain pump while Dr. Beck was in the operating room.  The court, however, will permit such testimony under Rules 801(d)(2)(C) and/or (D), even though Dr. Beck does not know the identity of this individual.

Also, Stryker objects to Dr. Beck's statement about "what he would have done" as too speculative.  The court, however, overrules Stryker's objection.  Contrary to Stryker's assertion, it has not rebutted  the "heeding presumption" as a matter of law.  Given the facts and circumstances at issue here, and reasonably inferring that Dr. Beck would not have used a pain pump in the intra-articular space had he been told of the alleged risk of harm, the court finds that this evidence is admissible, and therefore, a genuine issue of material fact has been created on the issue of causation.

221 P.3d 256, 269 (Utah 2009) (emphasis added).   Recklessness includes conduct where "the

actor kn[ew], or ha[d] reason to know . . . of facts which create a high degree of risk of physical

harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or

indifference to, that risk." *Id*. (quoting Restatement (Second) of Torts § 500 cmt. a (1965)).

　　　While Plaintiffs' evidence supporting a punitive damage award is admittedly thin, the

court has already ruled that the extent of Stryker's knowledge is a question of fact, and thus the

court declines to grant summary judgment on Plaintiffs' request for punitive damages at this

time.

### F.  SUMMARY

　　　In conclusion, the court joins the District of Oregon[8] in determining that Plaintiffs have

marshaled sufficient evidence to preclude summary judgment on their negligence and strict

liability claims against Stryker.  Given the evidence presented, a jury could reasonably conclude

that Stryker knew or reasonably should have known at the time it manufactured the pain pump

---

[8]　　See *Warner v. Stryker Corp*., 2011 WL 5999339 (D. Or. Nov. 28, 2011) (denying
Stryker's motion for summary judgment on claims of negligence, products liability, and punitive
damages because of fact issues as to whether Stryker knew or should have known of toxicity
concerns associated with the intra-articular administration of local anesthetics and whether it
acted with malice or reckless and outrageous indifference to a highly unreasonable risk of harm);
*Schoenborn* v. *Stryker Corp.,* Civ. No. 08-1419-AA, 2011 WL 2709550 (D. Or. July 11, 2011)
(same).
　　　The court notes that many other courts have reached the same conclusion in similar cases
against other pain pump manufactures.  *See, e.g., Monroe v. Zimmer*, 766 F. Supp. 2d 1012 (E.D.
Ca. 2011); *Musgrave* v. *Breg, Inc.,* 2011 WL 3876529 (S.D. Ohio Sept. 2, 2011); *Skavenski v.
Breg, Inc*., 2011 WL 2709108 (D. Or. July 11, 2011 ); *Kildow* v. *Breg, Inc.,* 2011 WL 2708292
(D. Or. July 11, 2011); *Hamilton* v. *Breg, Inc.,* 2011 WL 780541 (S.D. Ohio Jan. 20, 2011) *Koch*
v. *Breg, Inc.,* 2010 WL 5301047 (D.S.D. Dec. 20, 2010).

that it was dangerous, was likely to be dangerous, or created a foreseeable risk of harm."

## II.    STRYKER DEFENDANTS' MOTION CONCERNING PLAINTIFFS' EXPERTS AND PLAINTIFFS' CLAIM FOR  PSYCHOLOGICAL INJURY, AND  PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERTS AS CUMULATIVE

The parties have filed competing motions regarding the opposing party's number of experts on the issue of causation.  Stryker also seeks to limit the testimony of Plaintiffs' non-retained causation experts, or, alternatively, to compel their depositions.  Finally, Stryker seeks to strike Plaintiffs' claims for psychological injury and treatment and portions of their Life Care Plan expert's opinions, or, alternatively, to compel Rule 35 Psychological Evaluations.

### A.    STRYKER'S MOTION FOR PROTECTIVE ORDER RE: PLAINTIFFS' CUMULATIVE EXPERT CAUSATION EVIDENCE AND PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERTS AS CULMULATIVE

Stryker has moved for a protective order regarding Plaintiffs' designation of five orthopedic surgeons on medical causation issues.[9]  Stryker has suggested that only two orthopedic experts per side should address medical causation per Plaintiff.

Plaintiffs, on the other hand, contend that their causation evidence is not cumulative; rather, they argue, Stryker is simply trying to silence Drs. Beck, Paulos, and Metcalf, all non-retained experts.  Drs. Beck and Metcalf were treating physicians for Plaintiffs, and Dr. Paulos has knowledge regarding Stryker's conduct relative to orthopedic surgeons' use of pain pumps

---

[9]  Plaintiffs have designated (1) Dr. Beck; (2) Dr. Fukushima; (3) Dr. Metcalf; (4) Dr. Paulos; and (5) Dr. Kurzweil.

14

and also general causation.[10]   Plaintiffs argue that Drs. Beck and Paulos have personal

knowledge of facts that no other witness has.   Moreover, Plaintiffs claim Stryker has cumulative

expert testimony on both causation and on the state of scientific knowledge, and Plaintiffs have

filed their own motion to limit Stryker's experts based on the cumulative nature of their

testimony.

Plaintiffs have retained one expert (Dr. Kurzweil) to testify about general causation and

one expert (Dr. Fukushima) to testify about specific causation.  After receiving Stryker's expert

reports, Plaintiffs retained one Expert (Dr. Kurzweil) to rebut Stryker's specific causation

opinions).  Plaintiffs' other three experts–Drs. Beck, Metcalf, and Paulos–are non-retained

experts whose testimony is primarily factual because of their personal involvement in the events

leading up Plaintiffs' filing of this lawsuit.   The fact that these physicians have both factual

knowledge and expert opinions does not render their causation testimony cumulative of the

retained experts' opinions, and the court will permit these non-retained experts to opine on

causation.

Of course, Stryker argues that Plaintiffs will have the testimony of their treating

physicians, along with the causation experts, and therefore Stryker should be allowed to call

more than one general and one specific causation expert per Plaintiff.   Stryker, therefore, has

designated six experts to opine on both general and specific causation.   Apparently, two of the

orthopedists are prepared to testify about specific causation as to all Plaintiffs, and then the

_____

[10]   At the time of the briefing of this motion, Plaintiffs had agreed to produce Dr. Paulos
for deposition, and the court assumes this deposition has occurred.

additional orthopedic surgeons will testify as to causation only as to certain Plaintiffs.

While the court will not limit Defendants' experts to the extent sought by Plaintiffs, the court concludes that Defendants will not be permitted to call more than two specific causation experts per Plaintiff (from among the six who are designated).[11]   It is unclear how many separate experts on general causation Stryker seeks to call, but the court is optimistic that Stryker will call only one general causation expert.   In any event, to the extent Stryker seeks to call more than one general causation expert to cover all Plaintiffs, the court will not permit Stryker to call more than two general causation experts in total.

Plaintiffs also seek to limit the number of experts who testify as to the state of scientific knowledge at the time of Plaintiffs' injuries.   Stryker has designated eight such witnesses.   No more than three experts, however, will be permitted to testify on the state of scientific knowledge at the time of Plaintiffs' injuries.

The court notes that while some cumulative testimony is inevitable and serves a purpose in a trial, the court will further limit expert testimony at trial if either party presents excessive cumulative testimony.

### B.   STRYKER'S MOTION TO LIMIT TESTIMONY OF PLAINTIFFS' NON-RETAINED CAUSATION EXPERTS, OR, ALTERNATIVELY, TO COMPEL DEPOSITIONS

Additionally, Stryker moves to limit the testimony of two non-retained "causation" experts or, alternatively, to compel their depositions.   Stryker claims that these experts should be

---

[11]   Dr. Goulston, an infectious disease expert, may also be called to testify about specific causation as it pertains to Plaintiff David Elder.

limited to matters known to them and opinions reached by them at the time of their care for Plaintiffs, and not matters subsequently discovered due to scientific progress; otherwise, Stryker asserts, these witnesses and their opinions are indistinguishable from Plaintiffs' "retained" orthopedist experts and therefore they should have been designated as "retained" experts.

The court will not limit Dr. Beck's testimony to only present opinions regarding causation formed at the time of Plaintiffs' treatment.  He may testify as to his opinions based on the subsequently developed state of scientific and medical knowledge.  Similarly, the court will not limit Dr. Metcalf's testimony about the etiology of Plaintiffs' underlying conditions.

Moreover, the court declines to compel additional deposition of these physicians. Plaintiffs have provided the disclosures required under the 2010 amendment to Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure for all their non-retained experts.  Stryker contends that, if it is not allowed to redepose Drs. Beck and Metcalf, they would be forced to inquire of every treating physician about each and every "non-retained expert" opinion the doctor may later testify to, and the bases for such opinion.   But Stryker's sounding of the alarms has no merit in this particular case.   Stryker has deposed Dr. Beck through both deposition and trial testimony, it has asked him his expert opinions as an orthopedic surgeon in a five-and-a-half-hour deposition in this case, examined him again on his published article, and also examined him for nearly a full day in a March 2009 trial in Oregon.   It also deposed him over three days between August 2009 and January 26, 2010, in another case in the district of Oregon.  Moreover, Stryker has access to Dr. Beck's expert testimony in other pain pump cases against other manufacturers. Significantly, Stryker has not identified a single opinion in Dr. Beck's Rule 26(a)(2)(C) report

17

that it has not already asked him about.

In addition, it appears that Stryker's questioning of Dr. Metcalf went far beyond their opinions as treating physicians.  He was asked about other possible etiologies for chondrolysis generally, possible etiologies for three of the four plaintiffs he saw, and asked about his opinions on both general and specific causation.   Stryker has not identified any specific need to re-depose these physicians, and thus, Stryker's motion is denied.

      **C.**      **STRYKER'S MOTION TO STRIKE PLAINTIFFS' UNTIMELY CLAIMS FOR PSYCHOLOGICAL INJURY AND TREATMENT AND PORTIONS OF LIFE CARE PLAN EXPERTS' OPINION, OR, ALTERNATIVELY, TO COMPEL RULE 35 PSYCHOLOGICAL EVALUATIONS.**

Stryker argues that Plaintiffs never placed their mental condition "in controversy" during discovery, and thus, Plaintiffs' expert psychological injury evidence should be stricken because Stryker has not had a fair chance to defend itself against Plaintiffs' recent requests for damages for a lifetime of individual counseling.  Specifically, Stryker contends, each Plaintiff testified in their depositions that no psychological treatment was sought as a result of their shoulder injuries.[12]  Nevertheless, on May 27, 2011, after the close of fact discovery, Plaintiffs served a Rule 26 expert witness disclosure from Dr. James Gracey and Molly Struble.  Dr. Gracey opined that each Plaintiff will require a lifetime of individual counseling for psychological support and further understanding of their disability.

Stryker claims that it immediately retained and disclosed Dr. Trent Holmberg to rebut Dr. Gracey's opinions, but Dr. Holmberg's report states that his ability to reach firm conclusions was

---

[12]  *See* Stryker's Mem. in Supp. at 15 n.8.

"hampered because of the inability to conduct a full psychiatric evaluation." According to

Stryker, it has been prejudiced by a lack of opportunity to address these claims via Rule 35

examinations. Accordingly, Stryker submits, Dr. Gracey and Molly Struble's opinions regarding

lifetime counseling and therapy should be stricken under Rule 37(c). Alternatively, Stryker

claims it should be entitled to a Rule 35 psychological evaluation of each Plaintiff.

Plaintiffs, on the other hand, argue that their mental suffering has been specifically in

controversy for approximately two years. Plaintiffs' Fourth Amended Complaint states that

Plaintiffs seek damages, including, "General damages for severe physical pain, *mental suffering*,

inconvenience, and loss of the enjoyment of life," and "[p]ast, present, and future damages for

the costs of medical, surgical, and rehabilitative treatment, care, and equipment." According to

Plaintiffs, Stryker's request for a Rule 35 psychological examination "is nothing more than an

attempt to do an end run around [its] own lack of diligence." *See Mikis v. Howard,* 106 F.3d 754

(7th Cir. 1997). Plaintiffs also contend that Stryker indeed performed discovery into such

damages, such as questioning each of the Plaintiffs regarding their mental health and history of

mental health treatment.[13] In addition, Stryker also requested and received written discovery

responses relative to mental injuries.

Both sides cite to a variety of cases dealing with Rule 35 examinations, but very few of

the cases are instructive in this instance. While snippets of each case appear to offer guidance

on the issue, each case is fact-specific and context-dependent, and none of the cases cited is

---

[13] *See* Pls' Mem. in Opp'n at 4 n.12 (citing Plaintiffs' deposition testimony).

particularly instructive in light of the facts and circumstances involved in the instant case. Perhaps such a request for damages should have put Stryker on notice that a Rule 35 examination would be necessary, but it is understandable that Stryker did not pursue such an examination after Plaintiffs' deposition testimony.  From the evidence offered in the briefing, the court finds that it was not obvious that Plaintiffs would be seeking damages for a lifetime of counseling.[14]

In any event, Plaintiffs ultimately put their mental condition at issue when they submitted their Life Plans after the close of fact discovery.   The relevant issue now is whether, on the eve of trial, Defendants are entitled to conduct a Rule 35 psychological examination on each Plaintiff, which would inevitably delay the trial of this case.

The party seeking the Rule 35 exam must demonstrate a need for the information and a lack of means for obtaining the information elsewhere.  *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964).   In the context of this case, the court finds that a Rule 35 examination is unnecessary because Stryker has access to all of the information it needs to rebut Dr. Gracey's opinion as to the Plaintiffs' need for a lifetime counseling.  According to Plaintiffs, Stryker has subpoenaed Dr. James Gracey's complete file for each of the Plaintiffs, including all of his notes and analyses, and Plaintiffs represented that these would be produced when Stryker deposed Dr. Gracey in his September 20, 2011 deposition regarding the bases of his opinion that each of the

---

[14]  While *Mikis v. Howard*, 106 F.3d 754 (7th Cir. 1997) sheds some light on the issue, the court finds that there is a material difference in a case involving brain damage.   In that case,  a "life plan" was foreseeable from the nature of the injuries.  *Id*.  In the case at bar, Plaintiffs' shoulder injuries do necessarily give rise to distinct psychological injuries (apart from routine pain and suffering and emotional distress).

Plaintiffs will require psychological counseling.[15]

Thus, Stryker–and its expert–have all of the same information Dr. Gracey had in preparing his opinions, and Stryker has access to Plaintiffs' deposition testimony.   Thus, Stryker has sufficient evidence to use in its cross-examinations of Plaintiffs and Dr. Gracey (and Ms. Struble).   Therefore, the court declines to strike the psychological injury evidence, and it declines to permit a Rule 35 examination.[16]

## III.   PLAINTIFFS' MOTION TO STRIKE UNTIMELY DISCLOSED FACT WITNESSES

In the instant motion, Plaintiffs argue that on July 1, 2011–well after the discovery cutoff date–Stryker served supplemental disclosures identifying for the first time seven additional fact witnesses.[17]   Plaintiffs contend that they are severely prejudiced by this untimely disclosure and that the court should strike these untimely disclosed fact witnesses.

Stryker has clarified that four of these witnesses will not be called, but that Stryker still intends to call three of the witnesses:  Dr. Ilfeld, Doug Staunton, and Lisa Smith.  According to Stryker, it did not anticipate using testimony from any of these witnesses to support its defenses

---

[15]  Plaintiffs memorandum containing these representations was filed prior to the September 20, 2011 deposition.   The court assumes that the documents were produced and that the deposition took place.

[16]   Stryker has suggested that this evidence will not withstand a *Daubert* challenge in any event.   The court's ruling has no bearing on any future Daubert motion pertaining to the opinions of Dr. Gracey and/or Ms. Struble.

[17]  Dr. Ilfeld and Mr. Staunton had previously been designated as expert witnesses, and Plaintiffs do not object to the timeliness of the expert disclosure.

until Plaintiffs' expert disclosures were served on May 27, 2011.   Stryker contends that it

appropriately designated these witnesses soon thereafter.

Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that,

[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

The court finds that Stryker's failure to identify these three witnesses prior to May 27,

2011, was substantially justified because Stryker did not anticipate calling these individuals as

fact witnesses until after it received Plaintiffs' expert disclosures.   In addition, the failure to

disclose them previously was harmless because the identities of Dr. Ilfeld and Doug Staunton and

their roles in the relevant events pertaining to this litigation have been the subject of numerous

depositions and are described in many documents that have been in Plaintiffs' possession for

several years.   With respect to Lisa Smith, it appears that Plaintiffs knew about her testimony

even before Stryker did.   Therefore, the court denies Plaintiffs' motion, and Stryker may call

these three individuals as fact witnesses at trial.

## CONCLUSION

For the foregoing reasons and good cause appearing, **IT IS HEREBY ORDERED** that:

1.    Stryker's Motion for Summary Judgment [Docket No. 138] is **DENIED**;

2.    Stryker's Motion for Protective Order [Docket No. 142] is **DENIED.**   The court will not

limit the number of Plaintiffs' experts on causation evidence, and it will not limit the

testimony of its non-retained experts as requested by Stryker.   Moreover, the court will

22

not compel further depositions of these non-retained experts.  Finally, the court declines

to strike Plaintiffs' claims for psychological injury/treatment and portions of their Life

Care Plan experts' opinions, nor will the court compel Rule 35 psychological evaluations.

3.      Plaintiffs' Motion to Exclude Defendants' Experts as Cumulative [Docket No. 150] is

**GRANTED in part and DENIED in part**.  As explained above, the court will not limit

the number of Stryker's causation experts to the extent requested by Plaintiffs, but Stryker

will not be permitted to call more than two specific causation experts per Plaintiff (and no

more than six total), and it will not be permitted to call more two general causation

experts in total.  Stryker may not call more than three experts on the state of scientific

knowledge at the time at issue in this lawsuit.

4        Plaintiffs' Motion to Strike Untimely Disclosed Fact Witnesses [Docket No. 185] is

**DENIED**, and Stryker may call Dr. Ilfeld, Doug Staunton, and Lisa Smith as fact

witnesses at trial.

    DATED this 6th day of January,  2011.

                 BY THE COURT:

                 DALE A. KIMBALL
                 United States District Judge